**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**BOSTON BEEF CO., INC., Respondent.**

**No. 80–1836.**

United States Court of Appeals, First Circuit.

Argued June 3, 1981.

Decided July 9, 1981.

Ruth Ihne, New York City, with whom William A. Lubbers, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Acting Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel and W. Christian Schumann, Washington, D. C., were on brief, for petitioner.

Robert Weihrauch, Worcester, Mass., with whom Gerald E. Norman, Worcester, Mass., was on brief, for respondent.

Before COFFIN, Chief Judge, BOWNES, Circuit Judge, MAZZONE, District Judge.*

MAZZONE, District Judge.

This case is before us upon application of the National Labor Relations Board (Board) under section 10(e) of the National Labor Relations Act (Act), 29 U.S.C. § 160(e), for enforcement of its order issued against the Employer, Boston Beef Co., Inc., on September 30, 1980, and reported at 252 N.L. R.B. No. 101. The Board ordered Boston Beef to cease and desist from violating sections 8(a)(1) and 8(a)(5) of the Act, 29 U.S.C. §§ 158(a)(1) and (a)(5), bargain with the Union,[1] and post appropriate notices.

## I.

The action arises out of a representation election involving certain employees of Boston Beef, a wholesale meat distributor located in Worcester, Massachusetts. On October 18, 1979, the Union filed a representation petition with the Board's Regional Office in Boston, seeking certification as the collective bargaining representative of employees at the Employer's plant. On November 6, 1979, the Union and the Employer entered into a stipulation for certification upon consent election, authorizing a representation election in a unit consisting of the following employees:

> All full-time and regular part-time employees including drivers, loaders, shippers, receivers, packers, maintenance employees, shipping clerks, head shippers, head receivers and plant clericals of the Employer's plant located at Lafayette and Franklin Streets, Worcester, Massachusetts, but excluding office clerical employees, professional employees, guards and supervisors as defined in the Act.

---

* Of the District Court of Massachusetts, sitting by designation.

1. Local No. 170, affiliated with the International Brotherhood of Teamsters, Chauffeurs, Warehousemen & Helpers of America.

The Acting Regional Director approved this stipulation on November 15, 1979.

In the election, which was held December 5, 1979, fifteen votes were cast in favor of the Union and twelve against it. In addition, there were four challenged ballots, a sufficient number to have potentially affected the outcome of the election. Only one of the challenged ballots, however, that of Thomas Westerberg, is at issue here.[2] The Union challenged Westerberg's ballot on the ground that he was a "casual" rather than a "regular part-time" employee as provided in the stipulation, and therefore not entitled to vote in the representation election.

The Regional Director recommended that the Board sustain the challenge to Westerberg's ballot. A three member panel agreed, and on May 19, 1980, the Board certified the Union as the exclusive representative of employees in the stipulated unit.

Thereafter, the Employer refused to bargain with the Union, claiming that the Board incorrectly excluded Westerberg from the relevant bargaining unit. The Union filed unfair labor practice charges, and on June 30, 1980, the Regional Director issued a complaint. On August 29, 1980, the Board transferred the case to itself and, in the order issued September 30, 1980, granted the General Counsel's motion for summary judgment. The Board held that the Employer's refusal to bargain with the Union violated sections 8(a)(1) and 8(a)(5) of the Act, and ordered the remedial actions outlined above.

## II.

The facts underlying this controversy are not materially disputed. Thomas Westerberg began working for Boston Beef in June, 1979. During the summer, he worked an average of three nights a week, eight hours per night, loading trucks. At the end of the summer, Westerberg was laid off and returned to complete his final year of high school.

Westerberg was rehired in October, 1979, to do "display work" for the Employer at certain supermarkets in which Boston Beef had previously agreed to maintain display coolers for its products. He replaced another employee who left the respondent's employ due to illness. The display work involved replacement of old stock and rotation of Boston Beef products in the display coolers. Identical work is performed at other supermarkets by Westerberg's father, a full-time salesman for Boston Beef.[3]

Westerberg spent approximately five hours a week doing display work, and was paid a flat rate of fifty dollars per week. While performing this work, Westerberg did not spend time on the Employer's premises, and had no contact with unit employees. The record indicates that if Westerberg had any questions concerning his display work, he asked his father for assistance.

On November 1, 1979, some five weeks before the election, Westerberg began unloading trucks at the Employer's beef division on Thursday nights. Each week, Westerberg's father inquired as to whether sufficient work were available for his son on the upcoming Thursday night shift. Westerberg was not required to work Thursday nights, nor was he penalized for failing to appear for work. In fact, during the five weeks prior to the election, Westerberg worked only three Thursday nights. On the remaining Thursday nights, Westerberg did not work because of a conflict with his participation in his high school football program. When Westerberg did work the Thursday night shift, he generally worked for three hours and was paid by the hour.

---

**2.** The Board sustained a challenge to the ballot of one employee on the ground that he was no longer employed by Boston Beef. The Employer does not challenge that determination. The Board did not rule on the Union's two other challenges pending determination of this case because they would only become critical if we reversed and an evidentiary hearing would be necessary to resolve them.

**3.** It is undisputed that the Union and the Employer intended to exclude salesmen from the relevant bargaining unit.

He worked alongside unit employees, took the same breaks, and had the same supervision.

On these facts, the Regional Director and the Board concluded that Westerberg was not a "regular part-time" employee, and was therefore excluded from the relevant bargaining unit.

### III.

■ The Employer concedes, and we conclude, that the Board's order should be enforced if it properly sustained the Union's challenge to Westerberg's ballot. *Summa Corp. v. N.L.R.B.*, 625 F.2d 293, 295 (9th Cir. 1980). Our standard of review is restricted to an analysis of whether the Board abused its discretion in sustaining the challenge and certifying the election. *N.L.R.B. v. New England Lithographic Co., Inc.*, 589 F.2d 29, 31 (1st Cir. 1978), *quoting N.L.R.B. v. S. Prawer & Co.*, 584 F.2d 1099, 1101 (1st Cir. 1978).

The Employer first contends that the Board erroneously applied a "community of interest" test in determining that Westerberg was not a regular part-time employee. The community of interest standard is one traditionally relied on by the Board in determining whether an individual employee or job classification should be included in a particular collective bargaining unit. The test includes a consideration of whether the employee works at regularly assigned hours a substantial number of hours per week; performs duties similar to those of unit employees; and shares the same supervision, working conditions, wages, and fringe benefits as the unit employees. *See Westchester Plastics of Ohio, Inc. v. N.L.R.B.*, 401 F.2d 903, 907–08 (6th Cir. 1968). Boston Beef concedes that application of these principles is appropriate where the Board determines the appropriate bargaining unit in the first instance. However, it argues that community of interest principles are inapplicable where the Union and Employer have agreed upon a definition of the relevant unit prior to the election. In such cases, the Employer contends, the Board's only function is to ascertain the intent of the parties. *See The Tribune Company*, 190 N.L.R.B. 398 (1971). The Board may not rely upon community of interest principles to override a clear expression of the parties' intent. *Tidewater Oil Company v. N.L.R.B.*, 358 F.2d 363, 366 (2d Cir. 1966).

The Board contends that the phrase "regular part-time employees" is a phrase of art in the field of labor law. By including the phrase in the stipulation, it argues, the parties manifested their intent to resolve any dispute concerning unit membership according to the Board's established principles for determining "regular part-time" status, which includes a consideration of community of interest principles.

Although there is some support for the Board's contention that the phrase "regular part-time" employees has an established meaning in the labor context, *see, e. g., N.L.R.B. v. Sandy's Stores, Inc.*, 398 F.2d 268, 272 (1st Cir. 1968), we think the record in this case is unclear on the meaning the parties intended to give the phrase. More precisely, in view of his rather unique employment status, it is unclear whether the parties intended to include Westerberg in the category of "regular part-time employees" at the time the stipulation was drafted.

■ Under these circumstances, however, resort to the community of interest principles was nevertheless appropriate. While concededly the Board may not rely upon the community of interest test to subvert the clear intent of the parties, where the intent is unclear or the stipulation ambiguous the Board may properly rely upon community of interest principles to help resolve the ambiguity. *N.L.R.B. v. Mercy College*, 536 F.2d 544, 548 at n. 11 (2d Cir. 1976); *Knapp-Sherrill Co. v. N.L.R.B.*, 488 F.2d 655, 659–60 (5th Cir.), *cert. denied*, 419 U.S. 829, 95 S.Ct. 50, 42 L.Ed.2d 53 (1974); *see New England Lumber v. N.L.R.B.*, 646 F.2d 1, 3 (1st Cir. 1981). Accordingly, we find no error in the Board's use of the community of interest test in determining whether Westerberg should have been considered a regular part-time employee.

## IV.

Turning to the Board's substantive conclusion, the Employer argues that the Board abused its discretion in concluding that Westerberg was not a regular part-time employee. Concededly, there are facts in the record which arguably support the Employer's position, notably the fact that Westerberg's employment was not limited to a fixed period, and the fact that his working conditions during the Thursday night shift were substantially identical to those of the unit employees.

The Board has frequently attempted to define the circumstances under which student employees will be considered regular part-time employees. Our review of the cases indicates that the Board has often reached opposite conclusions on the basis of seemingly minor factual differences. *Compare San Francisco Art Institute*, 226 N.L.R.B. 1252 (1976); *Highview, Inc.*, 223 N.L.R.B. 646, 649 (1976), *enforced in pert. part*, 590 F.2d 174, *modified*, 595 F.2d 339 (5th Cir. 1979); *Pawating Hospital Association*, 222 N.L.R.B. 672, 672–73 (1976); and *California Inspection Rating Bureau*, 215 N.L.R.B. 780, 782–83 (1974) (part-time students excluded from units which included, *inter alia*, regular part-time employees) *with Dick Kelchner Excavating Co.*, 236 N.L.R.B. 1414, 1415 (1978); *Femco Machine Co.*, 238 N.L.R.B. 816, 826 (1978); *Hearst Corp., San Antonio Light Division*, 221 N.L.R.B. 324 (1975); *Serv-U-Stores, Inc.*, 225 N.L.R.B. 37, 39 (1976); and *Dee Knitting Mills, Inc.*, 214 N.L.R.B. 1041, 1048–49, *enforced*, 538 F.2d 312 (2d Cir. 1975) (students regarded as regular part-time employees). While concededly, the Board's application of the community of interest standard in this context has not always been a model of consistency, *see generally*, Malin, *Student Employees and Collective Bargaining*, 69 Ky.L.J. 1, 5–15 (1980), we are especially reluctant to substitute our judgment for that of the Board on an issue, such as this, where the Board possesses significant expertise and minor factual differences are so important, so long as there is substantial evidence to support the Board's conclusion.

In this case there is ample support in the record for the Board's conclusion that Westerberg did not share a community of interest in wages, hours, and working conditions with the remaining unit employees, and thus was properly not regarded as a regular part-time employee. To begin with, Westerberg's display work was performed at a geographically remote location, under the general supervision of his father, a non-unit employee. He was paid a flat weekly salary, as opposed to an hourly wage, for the display work. While performing the display work, Westerberg had no contact with unit employees.[4]

Turning to the Thursday night work, the Board could reasonably have placed great reliance upon the small number of hours Westerberg spent engaged in that work; the fact that he was not required to work Thursday nights and was not penalized in any way for failing to work; and the fact that he skipped work two out of the five weeks immediately preceding the election, in order to participate in his high school's football program. *Compare Sandy's Stores*, 398 F.2d at 273 (reversing the Board's finding of regular part-time status where employee, a high school student, worked only one day a week and missed work twenty per cent of the time).

Having found substantial evidence in the record to support the Board's conclusion that Westerberg was a casual rather than a regular part-time employee, and therefore properly excluded from the relevant bargaining unit, we affirm the Board's finding that the employer's refusal to bargain constituted an unfair labor practice and enforce its September 30, 1980 order in its entirety.

*Enforcement granted.*

---

4. The Employer attempted, in its brief and at oral argument, to characterize Westerberg's display work as being similar to the Thursday night loading work. The record clearly indicates significant differences in almost every aspect of the two jobs.